## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**TRISTAR PRODUCTS, INC.,**

    **Plaintiff,**

**v.**                              **CASE NO. 3:24-cv-238-MCR-HTC**

**TELEBRANDS CORPORATION,**
**WHELE LLC d/b/a PERCH, and**
**JEFFREY L. SNOW,**

    **Defendants.**

_____/

## <u>ORDER</u>

Defendants Telebrands Corp. ("Telebrands"), Whele LLC d/b/a Perch ("Perch"), and Jeffrey L. Snow ("Snow") have each moved to dismiss Plaintiff Tristar Products, Inc.'s ("Tristar") Complaint, ECF No. 1, for lack of personal jurisdiction and for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). *See* ECF Nos. 28, 29, 31.[1] Tristar opposes each motion. *See* ECF Nos. 44, 45, 46. All parties, to the extent requested, have been permitted to file replies, *see* ECF No. 55 & 56, or sur-replies, *see* ECF No. 59 & 60. After careful consideration, the Court will dismiss all of Tristar's claims.

---

[1] Telebrands also moves for dismissal pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *See* ECF No. 29. While Snow also discusses Rule 9(b), *see* ECF No. 31 at 30, he does not meaningfully argue for its application.

## I.    Background[2]

This case is the latest episode in a decade-long scorched-earth battle over valuable patents rights to expandable garden hose technology.  The feud has stretched through federal judicial districts in New Jersey, Delaware, Massachusetts, and Florida.  Suffice to say, the procedural history underlying this dispute is lengthy and complex.  It is not necessary to recount the entirety of that history for present purposes, but, alas, some of that background is undoubtedly required to understand how we arrived here.

At various times over the past decade, Tristar, Telebrands, and Perch have each marketed and sold competing expandable garden hose products.  *See* ECF No. 1

---

[2] The following facts are largely taken from the Complaint, ECF No. 1, but both sides have requested that the Court take judicial notice of certain public records filed with, or issued by, the United States Patent and Trademark Office ("Patent Office") and other federal and state courts. *See, e.g.*, ECF Nos. 29-1, 30, 44-12, 45-12, 46-12.  Neither side has objected to the other's requests. A court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment.  Fed. R. Evid. 201.  Accordingly, given the absence of a serious dispute as to the authenticity of these publicly available documents, the Court finds that they are appropriate for judicial notice.  *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999) (holding that the district court was authorized to take judicial notice of public documents filed according to SEC regulations for the purpose of determining what statements the documents contained); *see also Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) ("Public records are among the permissible facts that a district court may consider."); *Patagonia, Inc. v. Worn Out, LLC*, 2023 WL 3172530, at *5 (S.D. Fla. May 1, 2023) ("[D]ocuments submitted to, or issued by the [Patent Office], which have become part of the public record, and are easily accessible via the [Patent Office] website, . . . are judicially noticeable.") (collecting cases).

at ¶¶ 14, 44, 45.[3]  Tristar believes that it is the only company entitled to do so.  *Id.* at ¶ 116.  Expandable garden hoses are allegedly the brainchild of a man named Gary Ragner.  *Id.* at ¶ 12.  Ragner is a named inventor of dozens of patents relating to expandable garden hoses.  *Id.*  The precise patents at issue here are U.S. Patent Nos. 7,549,448 (the "'448 Patent"), 9,022,076 (the "'076 Patent"), 9,371,944 (the "'944 Patent"), and 9,182,057 (the "'057 Patent").  *Id.*

In 2012, Tristar reached an agreement with Ragner's company, Ragner Technology Corporation ("RTC"), for an exclusive license to his portfolio of expandable garden hose technology patents.  *Id.* at ¶ 14.[4]  Around that same time, Telebrands' predecessors began marketing and selling expandable garden hoses based on patents obtained by a rival inventor, Michael Berardi.  *Id.* at ¶ 39.  Ragner and Berardi were not strangers.  The two previously met a year earlier, in August 2011, when Ragner was attempting to procure a multimillion-dollar investment from Berardi to manufacture his expandable garden hose prototype.  *Id.* at ¶ 48; *see also Blue Gentian v. Tristar Prods., Inc.*, 632 F. Supp. 3d 627, 635 (D.N.J. 2021), *aff'd*

---

[3] As alleged in the Complaint, Tristar has sold its expandable garden hose products under the brand name "Flex-Able Hose," *see* ECF No. 1 at ¶ 14, Telebrands has sold similar products under the brand name "Pocket Hose," *see id.* at ¶ 44, and Perch has sold its offerings under the brand name "Flexi Hose," *see id.* at ¶ 45.

[4] By agreement, Tristar and RTC amended their exclusive licensing arrangement at least twice, in 2015 and 2017, respectively.  *See* ECF No. 1 at ¶¶ 25–38.

*sub nom. Blue Gentian, LLC v. Tristar Prods., Inc.*, 70 F.4th 1351 (Fed. Cir. 2023).

Ragner demonstrated his prototype and shared other proprietary information with

Berardi at that meeting. *See* ECF No. 1 at ¶ 48. But instead of investing in Ragner's

protype, Berardi decided to develop one of his own. *Id.* An avalanche of litigation

ensued. *Id.* at ¶¶ 39–46. Throughout those actions, Tristar and Telebrands were

staunch adversaries; Tristar asserted the Ragner patents against Telebrands, while

Telebrands asserted the Berardi patents against Tristar.

Nearly a decade later, on August 12, 2021, in a case still-pending today in the

District of New Jersey that the parties colloquially refer to as the "*Blue Gentian*

action," the district court decided that Ragner co-invented the patents asserted by

Berardi and Telebrands. *Id.* at ¶ 48; *see also Blue Gentian*, 632 F. Supp. 3d 627.

The Federal Circuit affirmed. *See* ECF No. 1 at ¶ 48; *Blue Gentian*, 70 F.4th 1351.

Tristar insists that the inventorship decision was a significant win; one that should

have brought an end to the lion's share of the litigation with Telebrands. *See* ECF

No. 1 at ¶¶ 48, 49, 118. It didn't. This case arises from events that transpired *after*

the *Blue Gentian* district court's inventorship decision.

As early as May 2022, Tristar claims that Telebrands and Perch began

meddling with its exclusive license to the RTC patent portfolio by conspiring to

wrongfully induce RTC to terminate that agreement. *Id.* at ¶¶ 50–65. On August

12, 2022, after exchanging draft agreements with Perch and supposedly negotiating with Telebrands, RTC terminated its exclusive licensing arrangement with Tristar.[5] Tristar immediately sued RTC for breach of contract and implied covenant of good faith and fair dealing based, among other things, on RTC's alleged failure to provide Tristar with the contractual right of first refusal embedded in its exclusive licensing arrangement. *See* Compl., *Tristar Prod., Inc. v. Ragner Tech. Corp.*, 3:22-cv-05043-MAS-DEA, ECF No. 1 (D.N.J. Aug. 12, 2022).[6]  Tristar sought an order enjoining RTC from terminating, and also reinstating, the exclusive licensing arrangement.

On October 25, 2022, much to Tristar's chagrin, RTC separately agreed to license its patent portfolio to Telebrands, with an option for Telebrands to acquire the portfolio outright down the road.[7]  Telebrands exercised that option on

---

[5] Tristar sued Perch on August 11, 2022 in the District of Massachusetts for patent infringement and later added a claim for tortious interference.  *See* Am. Compl., *Tristar Prods., Inc. v. Whele LLC d.b.a. Perch*, 1:22-cv-11301-DJC, ECF No. 30 (D. Mass. Nov. 22, 2023).  The latter claim for tortious interference remains pending as of the date of this Order.

[6] Tristar later voluntarily dismissed this action without prejudice, *see* Notice of Voluntary Dismissal Without Prejudice, *Ragner Tech. Corp.*, 3:22-cv-05043-MAS-DEA, ECF No. 15 (D.N.J. Jan. 23, 2023), and subsequently filed a materially identical action against RTC in Florida state court.  *See* Compl., *Tristar Prod., Inc. v. Ragner Tech. Corp.*, 2023-CA-898 (Fla. Alachua Cnty. Mar. 10, 2023).  Tristar voluntarily dismissed these claims against RTC—this time with prejudice—during the pendency of the instant case.  *See* Stipulated Order Dismissing Action With Prejudice, *Ragner Tech. Corp.*, 2023-CA-898 (Fla. Alachua Cnty. Oct. 14, 2024).

[7] Due to at least one non-disclosure agreement between RTC and Telebrands, the precise contours of the October 25, 2022 agreement are currently unknown to Tristar.  *See* ECF No. 1 at ¶ 58.

September 26, 2023, and RTC assigned "the entire rights, titles, and interests," ECF No. 30-2 at 4–5, to its expandable garden hose patent portfolio to Telebrands. *See* ECF No. 1 at ¶ 77.[8] And, despite the then-pending litigation over RTC's termination of its exclusive licensing arrangement with Tristar, RTC represented in the agreement that "it ha[d] the full right to convey the interest assigned" to Telebrands. ECF No. 30-2 at 4. Among those patents that RTC purportedly assigned to Telebrands were the '448 Patent, '076 Patent, '944 Patent, and '057 Patent. *Id.* at 6–7.

Notably, as detailed above, Tristar (and RTC) was prosecuting infringement actions—based on these very patents—*against* Telebrands at the time of the Telebrands-RTC assignment in September 2023 (and had been for the better part of a decade). *See* ECF No. 1 at ¶ 101. Tristar claims that Telebrands and its attorney, Defendant Jeffrey Snow, concocted a plan to fraudulently extinguish Tristar's pending patent infringement claims against Telebrands and its "rightful monopoly in the market for expandable and retractable hoses." *See* ECF No. 1 at ¶¶ 89, 116. According to Tristar, the scheme was two-fold, as described below.

---

[8] The Court notes that the Telebrands-RTC assignment agreement was executed after the Federal Circuit affirmed the *Blue Gentian* district court's inventorship decision on June 9, 2023. *Blue Gentian*, 70 F.4th 1351.

First, on September 27, 2023, Telebrands recorded the assignment agreement from RTC with the Patent Office, establishing Telebrands as the "owner of record" of RTC's patent portfolio. *Id.* at ¶¶ 89–93. Tristar contends that Telebrands' representations to the Patent Office that it was the new owner (and/or assignee) of the RTC patent portfolio were fraudulent because Telebrands knew the assignment agreement was void *ab initio*, as the patent rights were encumbered by Tristar's (i) contractual right of first refusal; and (ii) accrued rights to recover past infringement damages in then-pending actions.[9] Tristar further alleges that Telebrands and Snow intentionally withheld any reference to Tristar's then-pending lawsuits (i) against RTC over the effectiveness of RTC's termination of their exclusive licensing arrangement in Florida state court, *Ragner Tech. Corp.*, 2023-CA-898 (Fla. Alachua Cnty.); and (ii) for infringement of the RTC patents in the District of Delaware, *True Value Co.*, 1:15-cv-741 (D. Del.). Overall, Tristar claims that Telebrands and Snow deceived the Patent Office into believing that Telebrands was the lawful owner/assignee of the RTC patents.

---

[9] Specifically, Tristar refers to its patent infringement claims asserted in *Tristar Products, Inc. et al. v. National Express, Inc. et al.*, 2:13-cv-07752 (D.N.J.), *Ragner Tech. Corp. v. True Value Co.*, 1:15-cv-741 (D. Del.), and *Perch*, 1:22-cv-11301-DJC (D. Mass.). *See* ECF No. 1 at ¶ 115.

According to Tristar, the second part of the scheme occurred between October 31 and November 7, 2023, when Snow, "acting on behalf of and in concert with" Telebrands, submitted requests, as the patent owner of record, for *ex parte* reexaminations of the '448 Patent, '076 Patent, '944 Patent, and '057 Patent. *Id.* at ¶¶ 94–114.[10] The goal, Tristar says, was to fraudulently cancel all claims under these patents. *See id.*

Understanding the operative legal framework is necessary to grasp the import of part two of the alleged scheme. An *ex parte* reexamination is an administrative proceeding that the Patent Office conducts to evaluate the validity of an already-issued patent. *See* 35 U.S.C. § 301 *et seq.*[11] Anyone, not just the patent owner, may

---

[10] Snow is specifically alleged to have represented to the Patent Office, under 37 C.F.R. 3.73(c), that Telebrands was "[t]he assignee of the entire right, title, and interest" in each of the *ex parte* reexamination requests. *See* ECF No. 1 at ¶ 103.

[11] "To promote the Progress of Science and useful Arts," Congress created a patent system that grants inventors exclusive rights over their inventions throughout the United States for 20 year terms. U.S. Const., Art. I, § 8, cl. 8; *see* 35 U.S.C. § 154(a)(1). To secure a patent, inventors submit an application to the Patent Office that outlines the invention and sets out one or more "claims" that delineate the invention's scope (put differently, the metes and bounds of the invention). *See* 35 U.S.C. §§ 111–113. A patent examiner with expertise in the relevant field then reviews the application, considers any prior art (*i.e.*, the information available to the public at the time of the application), and determines whether the claims satisfy the statutory requirements for patentability, including that the claimed invention is useful, novel, nonobvious, and contains eligible subject matter. *Id.* at §§ 101–103, 112. "Sometimes, though, bad patents slip through." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 360 (2018). So, since 1980, Congress has granted the Patent Office the "authority to reexamine—and perhaps cancel—a patent claim that it had previously allowed." *Cuozzo Speed Techs. v. Com. for Intell. Prop.*, 579 U.S. 261, 267 (2016) (citing the *ex parte* reexamination statute, 35 U.S.C. § 301 *et seq.*). An *ex parte* reexamination is just one of the many avenues Congress has authorized to challenge the validity an issued patent. *See Return Mail,*

request an *ex parte* reexamination based on "prior art," which consists of patents or printed publications available when the challenged patent was first issued, at any time during a patent's lifespan. *Id.* at § 302.[12] To order reexamination, the Patent Office must identify a "substantial new question of patentability"—basically, a reason that the invention is potentially unpatentable, which was not previously considered by the Patent Office. *Id.* at § 303(a); *see SAS Inst.*, 584 U.S. at 360 ("Maybe the invention wasn't novel, or maybe it was obvious all along, and the patent owner shouldn't enjoy the special privileges it has received."); *see also In re Swanson*, 540 F.3d 1368, 1375 (Fed. Cir. 2008) ("The 'substantial new question of patentability' requirement prevents potential harassment of patentees by 'act[ing] to bar reconsideration of any argument already decided by the [Patent Office], whether during the original examination or an earlier reexamination.'" (citation omitted)) (cleaned up). If the Patent Office grants the reexamination request, the patent owner can (but is not required to) file a statement in response, including any amendments

---

*Inc. v. United States Postal Serv.*, 587 U.S. 618, 624–25 (2019) ("[A] patent can be reexamined either in federal court during a defense to an infringement action, in an *ex parte* reexamination by the Patent Office, or in the suite of three post-issuance review proceedings before the Patent Trial and Appeal Board.").

[12] The Director of the Patent Office may also launch an *ex parte* reexamination "[o]n his own initiative." *See* 35 U.S.C. § 303(a); *see also SAS Inst.*, 584 U.S. at 364 ("In the *ex parte* reexamination statute, Congress embraced an inquisitorial approach, authorizing the Director to investigate a question of patentability '[o]n his own initiative, and any time.'" (citation omitted)).

or cancellations they wish to make to their claims. 35 U.S.C. § 304. The reexamination then commences and earns its moniker, proceeding *ex parte* and "follow[ing] essentially the same inquisitorial process . . . as the initial Patent Office examination." *See SAS Inst.*, 584 U.S. at 360 (citing 35 U.S.C. § 305).

In December 2023, the Patent Office identified substantial new questions of patentability as to the '448 Patent, '076 Patent, '944 Patent, and '057 Patent and ordered their reexamination. *See* ECF Nos. 30-8–30-10, 63-31.[13] Following the Patent Office's reexamination orders, Tristar alleges that—by fraudulently portraying Telebrands as the patent owner—Telebrands and Snow were able to "voluntarily" cancel all claims under the '448 Patent, '076 Patent, '944 Patent, and '057 Patent, essentially rendering each a nullity. *See* ECF No. 1 at ¶¶ 102–114.

When Tristar became aware of Telebrands' and Snow's alleged two-part scheme to cancel the patents, Tristar sent letters to the Patent Office alerting it to what Tristar believed to be the full scope of the dispute over the rights to the patents

---

[13] The Patent Office found that substantial new questions of patentability existed with respect to the '448 Patent and '057 Patent based on "prior art." *See* ECF Nos. 30-10, 63-31. As to the '776 Patent and '944 Patent, the Patent Office identified substantial new questions of patentability based on "double patenting," ECF Nos. 30-8, 30-9, which "may exist where a . . . patent . . . and the patent under reexamination share the same inventive entity, at least one common (joint) inventor, . . . and/or a common owner/assignee." MPEP § 804(I)(E). Tristar has not specifically contended, in its Complaint or elsewhere, that the Patent Office's findings of substantial new questions in response to the reexamination requests turned on any assertion of ownership by Telebrands and Snow.

and the scheme's unlawful aims. *See id.* at ¶ 111.[14]  Given the *ex parte* nature of the proceedings, however, the Patent Office ordered those filings expunged.  *See, e.g.*, ECF Nos. 30-11, 30-12.[15]

Tristar says that in April 2024, the Patent Office provided the finishing touches to the alleged overall scheme by issuing certificates that cancelled the '448 Patent, '076 Patent, '944 Patent, and '057 Patent, effectively extinguishing both its "rightful monopoly in the market for expandable and retractable hoses," and its "outstanding patent infringement claims worth tens, if not hundreds, of millions of dollars."  *See* ECF No. 1 at ¶ 113, 116; *see also* ECF Nos. 30-13–30-16; *cf. Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1340–47 (Fed. Cir. 2013) (holding that when the Patent Office cancels a patent claim "the patentee loses any cause of action based on that claim, and any pending litigation in which the claims are asserted becomes moot").

---

[14] Tristar alleges that it only came to learn of Telebrands' and Snow's scheme through counsel for Perch on January 31, 2024.  *See* ECF No. 1 at ¶ 110.  Tristar contends that this fact, along with Snow's attendance at an in-person motions hearing on February 7, 2024, in Tristar's still-pending lawsuit against Perch in the District of Massachusetts, *Perch*, 1:22-cv-11301-DJC (D. Mass.), support the inference of a conspiracy between Telebrands and Perch to interfere with Tristar's then-existing exclusive licensing arrangement with RTC.  *See* ECF No. 1 at ¶ 110.

[15] Telebrands sent letters to the Patent Office urging it to expunge Tristar's filings.  *See* ECF No. 1 at ¶ 111.

On May 22, 2024, Tristar brought the instant action against Telebrands, Perch, and Snow. *See* ECF No. 1. The Complaint contains ten counts. Counts I and II allege that Telebrands, under Florida and New Jersey common law, tortiously interfered with Tristar's exclusive licensing arrangement with RTC. *Id.* at ¶¶ 121–140. Counts III and IV allege that Telebrands and Perch unlawfully conspired under Florida and New Jersey common law to tortiously interfere with Tristar's exclusive licensing arrangement with the goal of wrongfully inducing RTC to terminate Tristar's rights in the patents at issue. *Id.* at ¶¶ 141–152. In Counts V and VI, Tristar alleges that Telebrands and its outside counsel, Snow, committed fraud under Florida and New Jersey common law by (i) lying to RTC about the prospective effect that the assignment agreement with Telebrands would have on its pending infringement actions; and (ii) falsely representing to the Patent Office that Telebrands was the lawful assignee of RTC's patent portfolio, including the '448 Patent, '076 Patent, '944 Patent, and '057 Patent. *Id.* at ¶¶ 153–180. Tristar seeks treble damages under Count VII pursuant to the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), 1964(c), alleging that Telebrands and Snow formed a criminal enterprise and committed wire fraud at least eight times by misrepresenting to the Patent Office that it was the lawful assignee of the '448 Patent, '076 Patent, '944 Patent, and '057 Patent. *Id.* at

¶¶ 181–185.  Counts VIII and IX claim that Telebrands and Snow unlawfully conspired under Florida and New Jersey common law to commit the fraud alleged in Counts V and VI.  *Id.* at ¶¶ 186–213.  And Count X, brought pursuant to the Clayton Act's private right of action, 15 U.S.C. § 15, alleges that Telebrands and Snow attempted to monopolize the market for "expandable and retractable hoses" in violation of the Sherman Act, 15 U.S.C. § 2, and seeks treble damages.  *Id.* at ¶¶ 214–230.

## II.    Legal Standards

### A.    Rule 12(b)(2)

A court must have personal jurisdiction over the parties before it.  *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 n.6 (11th Cir. 1999) (per curiam).  To withstand a motion to dismiss pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, a plaintiff must plead sufficient facts, taken as true, to establish a *prima facie* case of personal jurisdiction over a nonresident defendant.  *See Virgin Health Corp. v. Virgin Enters. Ltd.*, 393 F. App'x 623, 625 (11th Cir. 2010).  A motion to dismiss for lack of personal jurisdiction can be based on either a facial or factual challenge to the complaint.  On a facial attack, courts take the allegations in the plaintiff's complaint as true and determine whether the plaintiff has pleaded sufficient facts to establish a *prima facie* case of personal jurisdiction.  *See United*

*Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009); *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). On a factual attack, courts may consider evidence and resolve factual disputes. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013); *cf. AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1364–65 (11th Cir. 2021) (when a defendant challenges personal jurisdiction pursuant to Rule 12(b)(2), courts have discretion to either hold an evidentiary hearing before trial and make factual findings about personal jurisdiction or decide the motion to dismiss "under a prima facie standard" without an evidentiary hearing).

## B.     Rules 9(b) and 12(b)(6)

Similarly, a complaint that fails to state a claim is subject to dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 12(b)(6). Federal pleading rules require only "'a short and plain statement of the claim showing that the pleader is entitled to relief,'" not detailed allegations. *See Ashcroft v. Iqbal,* 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). But "[t]hreadbare recitals of the elements," conclusory statements, labels or mere legal conclusions will not suffice. *Id.* When

considering a Rule 12(b)(6) motion, the Court accepts the factual allegations as true and construes all reasonable factual inferences in the light most favorable to the plaintiff. *See Butler v. Sheriff of Palm Beach Cnty.,* 685 F.3d 1261, 1265 (11th Cir. 2012); *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1196 (11th Cir. 2010). But, when claims sound in fraud or mistake, as many of Tristar's do, the plaintiff must also satisfy the heightened pleading requirements of Rule 9(b), and allege the "who, what, when, where, and how," *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (internal marks omitted), of the alleged fraud. *See* Fed. R. Civ. P. 9(b).

## III.   Discussion

The Court begins—and, as will become apparent, largely ends—with personal jurisdiction. *See Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 940 (11th Cir. 1997) ("A defendant . . . not subject to the jurisdiction of the court cannot be bound by its rulings"). Curiously, the parties limited their discussion of personal jurisdiction to the traditional analysis, fashioning their arguments around Florida's long-arm statute, Fla. Stat. § 48.193, and the Fourteenth Amendment's "minimum contacts" requirement, *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985), ignoring the impact of the proverbial elephants in the room—RICO and the Clayton Act—on the proper exercise of

personal jurisdiction here.   The Court's discussion will therefore proceed in two phases, focusing first on the potential exercise of jurisdiction based on Tristar's federal claims, and then turning to the same inquiry with respect to its state law claims.   In both instances, the Court will ultimately be tasked with evaluating the merits of Defendants' Rule 12(b)(6) arguments.

### A.    Federal Law Claims:  Statutory Bases for Personal Jurisdiction

Both RICO and the Clayton Act provide for nationwide service of process. *See* 18 U.S.C. § 1965(d) (RICO's nationwide service provision); 15 U.S.C. § 22 (The Clayton Act's nationwide service provision); *see also Republic of Panama*, 119 F.3d at 942 ("When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction.").[16]  If the Court can properly exercise specific jurisdiction over Telebrands and Snow by virtue of either statute, then it may exercise pendent personal jurisdiction over the remaining state law claims against them and bypass the traditional personal jurisdiction analysis under Florida's long-arm statute.  *See SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1231 (11th Cir. 2023) ("[O]nce it is established that the defendants had enough contacts

---

[16] Because Tristar does not bring RICO or antitrust claims against Perch, it may not avail itself of the nationwide service of process provisions included in those statutes to establish personal jurisdiction over Perch.  In addition, since the filing of the Complaint, Tristar has abandoned its attempted monopolization claim against Snow.

CASE NO. 3:24-cv-238-MCR-HTC

for it to be fair to haul them into court in the forum state on one claim, the personal-jurisdiction inquiry has served the bulk of its purpose."); *see also Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180–81 (9th Cir. 2004) ("Pendent personal jurisdiction is typically found where one or more federal claims for which there is nationwide personal jurisdiction are combined in the same suit with one or more state or federal claims for which there is not nationwide personal jurisdiction."). However, for the Court to exercise personal jurisdiction over Tristar's federal claims via the statutes' nationwide service provisions in the first instance, Tristar must show (i) that Telebrands and Snow were properly served a summons, or waived service, pursuant to Federal Rule of Civil Procedure 4(k)(1)(C); (ii) that it has stated a colorable RICO or antitrust claim, *see Republic of Panama*, 119 F.3d. at 941; and (iii) that the exercise of personal jurisdiction comports with due process, *see id.* at 942 (citations omitted). Assuming those three factors are met, the federal claims may serve as a jurisdictional anchor for the exercise of pendent jurisdiction over Tristar's remaining state law claims—provided that Tristar's federal claims also state a plausible claim for relief under Federal Rule of Civil Procedure 12(b)(6). *See Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1232 (S.D. Fla. 2017) ("Plaintiffs' RICO claim must survive a 12(b)(6) analysis if it is to serve as

the basis for the Court's personal jurisdiction over Plaintiffs' remaining state law claims").

The first and third inquiries are easily resolved in Tristar's favor. As to service, the docket reflects that Snow was served at his residence in Chappaqua, New York, *see* ECF No. 12,[17] and that Telebrands was served via its registered agent in Pennsylvania, *see* ECF No. 14. Regarding due process, the constitutional inquiry is governed by the Fifth—not Fourteenth—Amendment*, see Republic of Panama*, 119 F.3d. at 947, which means the Court examines Telebrands' and Snow's "aggregate contacts with the nation as a whole rather than [their] contacts with the forum state." *Id.*; *see also S.E.C. v. Carrillo*, 115 F.3d 1540, 1544 (11th Cir. 1997) ("[T]he applicable forum for minimum contacts purposes is the United States in cases where . . . the court's personal jurisdiction is invoked based on a federal statute authorizing nationwide or worldwide service of process."). Neither Telebrands nor Snow can seriously dispute that they maintain sufficient minimum contacts with the United States as a whole. Telebrands is both incorporated and headquartered in New

---

[17] Snow's wife accepted service on his behalf at his residence. *See* ECF No. 12. Snow does not contend that this method of service was insufficient. *Cf. Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1293 (11th Cir. 2021) (observing that "[p]ersonal jurisdiction and proper service are distinct requirements and distinct objections," and holding that defendant's waiver of right to contest a particular service method did not waive any objection to personal jurisdiction).

Jersey, and markets and sells products throughout the United States. *See* ECF No. 1 at ¶¶ 2, 8. Snow has lived and worked in New York for decades. *Id.* at ¶ 4; *see* ECF No. 31 at 18. Neither has demonstrated (as they have the burden to) that the assertion of jurisdiction in this forum will make litigation "so gravely difficult and inconvenient" that they will be at a "severe disadvantage" as compared to their opponent. *See Republic of Panama*, 119 F.3d. at 947 ("We emphasize that it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern.").

The second inquiry is considerably more problematic for Tristar, however. As previewed above, before Tristar can avail itself of the jurisdictional hooks in RICO or the Clayton Act, the Court must decide whether Tristar has stated a colorable claim under either statute. *Id.* at 941. Asking whether a claim is colorable is a different question than asking whether a claim is plausibly alleged under Rule 12(b)(6). *Id.* at 941–42 (citing *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993)). It's a much lighter burden. Indeed, the Eleventh Circuit cautions that courts should only dismiss for want of jurisdiction in these circumstances if "'the [federal statutory] right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise devoid of merit

as not to involve a federal controversy.'" *Id.* at 941 (quoting *Herrmann*, 9 F.3d at 1055).

With this in mind, the Court finds that Tristar's federal statutory claims are colorable—but only by a whisker.[18]  At the highest level of abstraction, Tristar's RICO and Clayton Act claims pass the smell test.  *See, e.g., Sabrina Roppo v. Travelers Com. Ins. Co.*, 869 F.3d 568, 588–89 (7th Cir. 2017) ("We cannot conclude, therefore, that [the plaintiff's] allegations of a RICO enterprise [between a corporation and its outside counsel], although lacking in detail, are wholly insubstantial or frivolous.").  However, as explained below, notwithstanding their colorability, the Court concludes that neither Tristar's RICO claim nor antitrust claim can support the exercise of pendent jurisdiction over Tristar's state law claims because these federal statutory claims do not survive Telebrands' and Snow's tougher Rule 12(b)(6) challenge.

### 1.    Count VII:  Civil RICO (Against Telebrands and Snow)

Congress enacted RICO in 1970 in an effort to eradicate organized crime in the United States.  *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 245 (1989).  It is

---

[18] The Court expresses no opinion on the merits of Telebrands' and Snow's respective motions for sanctions against Tristar and its outside counsel, Fried, Frank, Harris, Shriver & Jacobson LLP, pursuant to, *inter alia*, Rule 11 of the Federal Rules of Civil Procedure.  *See* ECF Nos. 62, 69.  Those motions remain under consideration.

well-established, however, that RICO's reach is not limited to mobsters or conduct that is otherwise "characteristic . . . of organized crime in the traditional sense." *Id.* at 243; *see also Boyle v. United States*, 556 U.S. 938, 944 (2009) ("[T]he RICO statute provides that its terms are to be liberally construed to effectuate its remedial purposes.") (internal marks omitted). Indeed, the statute makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). On top of severe criminal penalties, RICO also provides a private, civil cause of action to "[a]ny person injured in his business or property by reason of a violation of" RICO's substantive provisions. 18 U.S.C. § 1964(c).

Civil RICO is a notoriously powerful tool. *See Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir. 1991) ("Civil RICO is an unusually potent weapon—the litigation equivalent of a thermonuclear device."). To advance beyond the pleading stage, courts therefore require civil RICO plaintiffs to plausibly allege "six elements: that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering,

which (5) caused (6) injury to the business or property of the plaintiff." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020).

Generally speaking, private plaintiffs have not been successful in the use of RICO to police misconduct or punish fraud before the Patent Office. In *Semiconductor Energy Laboratory Co., Ltd. v. Samsung Electronics Co., Ltd.*, the Federal Circuit made clear that fraudulent statements to the Patent Office during the patent application process "cannot qualify as an act of mail fraud or wire fraud for purposes of [RICO's] predicate act requirement." 204 F.3d 1368, 1378–80 (Fed. Cir. 2000). And in the 45 years since Congress created the *ex parte* reexamination process, there has not been one instance of a private plaintiff successfully maintaining a RICO suit based on purported fraud or misconduct during a patent reexamination. In fact, this theory of RICO liability appears to have been uniformly rejected by every court to have considered it. *See, e.g.*, *LCS Grp., LLC v. Shire LLC*, 2019 WL 1234848, at *9 (S.D.N.Y. Mar. 8, 2019), *judgment aff'd, appeal dismissed in part sub nom. LCS Grp., LLC v. Shire Dev. LLC*, 2022 WL 1217961 (2d Cir. Apr. 26, 2022) (dismissing RICO claim based on alleged misrepresentations to Patent Office during reexamination proceedings with prejudice); *Lockwood v. Sheppard, Mullin, Richter & Hampton, LLP*, 2009 WL 9419499, at *5–7 (C.D. Cal. Nov. 24,

2009), *aff'd*, 403 F. App'x 508 (Fed. Cir. 2010) (per curiam) (same).  This decision will now add to that list.

### a.    Racketeering Activity

The low-hanging fruit first.  Any cognizable civil RICO claim requires the plaintiff to plead at least two predicate acts of racketeering, which implicate a long list of state and federal crimes.  *See* 18 U.S.C. § 1961(1), (5).  This requires Tristar to "put forward enough facts with respect to each predicate act to make it independently indictable as a crime."  *Cisneros*, 972 F.3d at 1215 (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997)).

Tristar alleges at least eight instances of wire fraud under 18 U.S.C. § 1343.  In each instance, Tristar claims that the putative Telebrands-Snow enterprise falsely told the Patent Office that Telebrands was the patent owner of the '448 Patent, '076 Patent, '944 Patent, and/or '057 Patent.  Those assertions of ownership, Tristar contends, are actionable misrepresentations because both Telebrands and Snow knew that RTC's assignment of its patent rights to Telebrands was void *ab initio* (legalese for 'from the beginning') as Telebrands was aware that Tristar possessed a contractual right of first refusal and that Tristar and RTC were actively litigating the effectiveness of RTC's termination of their exclusive licensing arrangement in Florida state court, *Ragner Tech. Corp.*, 2023-CA-898 (Fla. Alachua Cnty.).  *See*

*Pruco Life Ins. Co. v. Wells Fargo Bank, N.A.*, 780 F.3d 1327, 1332 (11th Cir. 2015) ("A contract that is void *ab initio* is a contract that never existed.") (italics added).[19] Moreover, according to Tristar, even if the assignment was valid, Telebrands and Snow knew that Telebrands was not "[t]he assignee of the *entire* right, title, and interest,"[20] because any acquired rights were subject to Tristar's already accrued rights to recover for Telebrands' infringement of those same patents in the actions pending in New Jersey and elsewhere. *See e.g.*, *National Express*, 2:13-cv-07752 (D.N.J.). Put differently, for all the Sturm und Drang in the Complaint, Tristar's factual allegations boil down to this: Telebrands and Snow took a position on a contested legal question before a federal agency. Was that position aggressive or even cavalier? Maybe so. But did it rise to the level of a crime indictable under the wire fraud statute? Certainly not.

Wire fraud requires that a defendant "(1) intentionally participates in a scheme or artifice to defraud another of money or property, and (2) uses or 'causes' the use of the . . . wires for the purpose of executing the scheme or artifice." *United States*

---

[19] The Court, of course, is "not bound to accept as true . . . legal conclusion[s] couched as . . . factual allegation[s]." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

[20] ECF No. 1 at ¶ 103 (emphasis added) (quoting 37 C.F.R. 3.73(c) Statement).

*v. Bradley*, 644 F.3d 1213, 1238 (11th Cir. 2011) (quoting *United States v. Ward*, 486 F.3d 1212, 1222 (11th Cir. 2007)).

Telebrands and Snow did not pull out of thin air the notion—or falsify documents to suggest—that RTC had assigned its patent rights to Telebrands. They had an agreement in hand (at least ostensibly) conferring as much from a party, RTC, that had been Telebrands' litigation adversary for nearly a decade. *See* ECF No. 1 at ¶¶ 77–79, 85. Even viewed in the light most favorable to Tristar, Telebrands and Snow accordingly had an objective basis for believing that Telebrands was the lawful assignee of RTC's patent portfolio at the time they made these representations of ownership to the Patent Office.[21] Taking a position on a question of law like this

---

[21] The mere fact that Tristar was contesting RTC's termination of its exclusive licensing arrangement in Florida state court at the time Telebrands allegedly obtained the patent assignment from RTC is no refuge for Tristar's cause. In the assignment agreement, RTC represented that "it ha[d] the full right to convey the interest assigned . . . and . . . ha[d] not executed and will not execute any agreement in conflict" with the agreement. *See* ECF No. 30-2 at 4. Telebrands and its lawyer, Snow, were entitled to rely on that representation which—at the very least—provided an objective basis for their subsequent representations to the Patent Office that Telebrands was the assignee of the RTC patents. In any event, Tristar has since dismissed its Florida state court lawsuit against RTC with prejudice, *see Ragner Tech. Corp.*, 2023-CA-898 (Fla. Alachua Cnty. Oct. 14, 2024), removing any viable claim that RTC's termination was ineffective or wrongful. *See Royal Palm Vill. Residents, Inc. v. Slider*, 57 F.4th 960, 974 (11th Cir. 2023) (Newsom, J., concurring) (observing that the Florida Supreme Court "has explained that a plaintiff's voluntary dismissal *with* prejudice qualifies the defendant as the prevailing party precisely because the dismissal was 'with prejudice, thus signaling an end to the litigation.'" (quoting *Thornber v. City of Fort Walton Beach*, 568 So. 2d 914, 919 (Fla. 1990))). While this may not bar the instant suit (the Court expresses no opinion on this score), it undeniably diminishes the plausibility of Tristar's allegations of wire fraud. *Iqbal*, 556 at 678 (there must be "more than a sheer possibility that a defendant has acted unlawfully").

cannot form the basis for wire fraud. *See LCS Grp.*, 2019 WL 1234848, at *10 ("Litigation positions taken on legal questions—such as the [patent reexamination] petition—cannot form the basis for [wire] fraud."); *see also Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 940 (9th Cir. 2006) (affirming Rule 12(b)(6) dismissal of RICO claims premised on prelitigation demand letters and phone conversations where defendant allegedly made false representations of law because such statements "are not actionable as fraud, including under the mail and wire fraud statutes"); *Dual Diagnosis Treatment Ctr., Inc. v. Centene Corp.*, 2021 WL 4464204, at *5 (C.D. Cal. May 7, 2021) (dismissing RICO claim when "alleged 'misrepresentations' appear[ed] to reflect disagreements about the interpretation of the relevant [contracts] or the governing law. And 'fraud [generally] cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law.'" (citation omitted)) (third alteration in original); *S. Snow Mfg. Co. v. SnoWizard Holdings, Inc.*, 912 F. Supp. 2d 404, 421 (E.D. La. 2012), *aff'd*, 567 F. App'x 945 (Fed. Cir. 2014) ("SnoWizard's representations to customers and competitors regarding its intellectual property rights cannot constitute RICO violations. This position is

further buttressed by the general rule that fraud cannot be predicated upon misrepresentations of law.").[22]

That Tristar was, at the time of the alleged wire fraud, suing Telebrands for infringing the very patents Telebrands asserted ownership over does not compel a different result. Long ago, the Supreme Court held that the conveyance of a patent does not normally include the right to recover for injuries felt by the prior owner. *See Moore v. Marsh*, 74 U.S. 515, 521 (1868) ("[I]t is a great mistake to suppose that the assignment of a patent carries with it a transfer of the right to damages for an infringement committed before such assignment."). The right to sue for prior infringement is therefore separate and distinct from the ownership rights over the

---

[22] To the extent Tristar's RICO claim can be construed as alleging that Telebrands and Snow committed wire fraud by failing to cite certain pending cases involving the '448 Patent, '076 Patent, '944 Patent, and '057 Patent to the Patent Office, it also fails. True, a defendant may commit wire fraud by omission. *See Kemp v. American Telephone & Telegraph Co.*, 393 F.3d 1354, 1359–60 (11th Cir. 2004) ("[N]ondisclosure of material information, even in the absence of any patently false statements, can also constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose."). But Telebrands and Snow are only alleged to have withheld citations to publicly available judicial records, which as a matter of law cannot constitute a scheme or artifice to defraud under 18 U.S.C. § 1343. *See Meier v. Musburger*, 588 F. Supp. 2d 883, 911 & n.15 (N.D. Ill. 2008) (nondisclosure of publicly available information cannot serve as RICO predicate act) (citing *United States v. Brown*, 79 F.3d 1550, 1559 (11th Cir. 1996), *overruled on other grounds by United States v. Svete*, 556 F.3d 1157 (11th Cir. 2009)). To find otherwise would seemingly permit attorneys, for example, to be prosecuted or subjected to treble damages under RICO for failing to cite adverse binding authority during litigation. *See, e.g.*, Am. Bar Ass'n Model Rules of Prof'l Conduct R. 3.3(a) (imposing, with limited exceptions, a duty on lawyers to cite controlling authority that is "directly adverse" to the position the lawyer's client is taking). That would be an absurd outcome.

CASE NO. 3:24-cv-238-MCR-HTC

patent itself. *See Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 43 (1923) (the assignee may sue for past infringement if the "owner assigns the patent and also the claim for past infringements to the same person"); *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1117 (Fed. Cir. 1996) ("Under the general rule, the bare reference to all right, title, and interest does not normally transfer the right to sue for past infringement."). Consequently, Tristar's supposed retention of its right to continue its already-initiated infringement suits against Telebrands and others does not place a cloud over Telebrands' ownership rights—or allow for the corresponding inference that Telebrands and Snow misrepresented those rights to the Patent Office.

To put it bluntly, none of the conduct alleged in the Complaint comes even close to racketeering. *See Lockwood*, 2009 WL 9419499, at *6 (dismissing RICO claim where plaintiffs did "not allege that [d]efendants suborned perjury or falsified evidence," but "merely allege[d] that [d]efendants breached their duty of candor to the [Patent Office] and the courts while defending their clients in actions brought by [p]laintiffs"). At their core, Tristar's allegations of wire fraud rest on the premise that Telebrands and Snow were somehow required to construct legal arguments that the assignment of patent rights that Telebrands had just bargained for and purchased was invalid and present those arguments to the Patent Office. Telebrands and Snow

surely were not required to do so. *Cf. Reynolds v. East Dyer Development Co.*, 882 F.2d 1249, 1252 (7th Cir. 1989) ("Not all conduct that strikes a court as sharp dealing or unethical conduct is a 'scheme or artifice to defraud.'"); *Harte Biltmore Ltd. v. First Pennsylvania Bank, N.A.*, 655 F. Supp. 419, 421 (S.D. Fla. 1987) ("A client who retains an attorney to represent him expects the attorney's undivided loyalty as [its] advocate and champion." (internal marks omitted)).    Imposing such a requirement would threaten to distort our system of representation and chill legitimate First Amendment petitioning. *See United States v. Pendergraft*, 297 F.3d 1198, 1208 (11th Cir. 2002) ("[P]rosecuting litigation activities as federal [RICO] crimes would undermine the policies of access and finality that animate our legal system."); *see also Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088 (11th Cir. 2004) (similar).    That perverse result, too, the Court cannot accept.

### b.    Enterprise

The Complaint also fails to plausibly allege that together Telebrands and Snow formed an association-in-fact enterprise. *See* 18 U.S.C. § 1961(4) (defining "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity"); *see also Boyle*, 556 U.S. at 947 (observing that the "evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may

in particular cases coalesce'" (citation omitted)).[23]  Crucially, "a RICO enterprise

must be an entity separate and distinct from any individual defendant." *Cisneros*,

972 F.3d at 1215 (citing *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158,

161 (2001)).  To state a civil RICO claim, in other words, the Complaint must

establish a distinction between the defendant RICO "person" and the broader RICO

"enterprise."  *United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1271 (11th Cir.

2000) (en banc) ("We now agree with our sister circuits that, for the purposes of 18

U.S.C. § 1962(c), the indictment must name a RICO person distinct from the RICO

enterprise.").[24]

Labels aside, the upshot is that Tristar could not name Telebrands as both the

named defendant and the entire enterprise and expect to state a plausible civil RICO

claim.  Tristar had to find at least one other person or entity to jerry-rig a RICO

---

[23] An association-in-fact enterprise must possess three qualities: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.  It need not have a hierarchical structure, specific governing procedures, or fixed roles for its members, *id.* at 948, but there must be "evidence of an ongoing organization, formal or informal, and . . . evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Neither Telebrands nor Snow specifically contest these elements in the present motions.

[24] This requirement stems from RICO's statutory language, which makes it "unlawful for any person employed by or associated with any enterprise" to engage in racketeering activities through that enterprise.  *See* 18 U.S.C. § 1962(c).  Because it is illogical to suggest that a person could employ or associate with him/herself, an enterprise may not simply be a "'person' referred to by a different name." *Cedric Kushner,* 533 U.S. at 161.

enterprise. So, Tristar named Telebrands' outside counsel, Snow, who allegedly guided Telebrands through the *ex parte* reexamination proceedings with the Patent Office, as a member of the putative enterprise. RICO's distinctiveness requirement, however, is not so easily evaded. In *Ray v. Spirit Airlines, Inc.*, the Eleventh Circuit explained "that plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation." 836 F.3d 1340, 1357 (11th Cir. 2016). This is because every corporation as a matter of course—and, indeed, by necessity—acts through its officers, agents, and employees. *Id.* ("[A] corporate defendant acting through its officers, agents, and employees *is simply a corporation*.") (emphasis added). And "[n]o matter how broadly RICO is interpreted, there is no reason to think that Congress intended the law to provide treble damages in every conceivable case of corporate fraud." *Id.*

Sensing the writing on the wall, Tristar makes two arguments to try to sidestep the Eleventh Circuit's holding in *Ray*. Neither has any merit.

First, although the Complaint is replete with allegations that Snow's actions before the Patent Office were "on behalf of" Telebrands, Tristar contends that Snow's conduct fell outside the run-of-the-mill provision of professional services and thus outside the scope of his agency. Admittedly, the possibility that Telebrands

and its outside counsel could together form a RICO enterprise is not without support in the case law of courts outside the Eleventh Circuit.  *See Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 362 (9th Cir. 2005) (observing that "[j]ust as a corporate officer can be a person distinct from the corporate enterprise, DuPont is separate from its legal defense team" and holding, therefore, that "the district court erred in concluding that Plaintiffs failed to allege a distinct RICO enterprise").  But a closer review reveals that these instances are the rare exception—reserved for only the most extreme and egregious unlawful acts taken under the guise of providing legal services.  *See, e.g.*, *United States v. Console*, 13 F.3d 641, 651 (3d Cir. 1993) (holding that outside counsel and doctor constituted a RICO enterprise when engaging in scheme to defraud insurance companies by submitting inflated medical bills on behalf of accident victims represented by the law firm).

Nothing of the sort is alleged here.  At most, Snow is alleged to have performed the relatively anodyne tasks of recording an assignment agreement with the Patent Office and checking a box certifying that Telebrands was the owner of the patents it sought to have reexamined and ultimately cancelled.  The other ancillary allegations that Tristar says portend wrongdoing—that Snow guided a lay client through an unfamiliar agency procedure, drafted legal petitions, and formulated legal arguments at the intersection of litigation and patent prosecution—all fall squarely

within the traditional provision of legal services. *See Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013) (holding that the defendant corporation (and parent company), its chief operating officer, and its corporate counsel could not form an enterprise because the complaint merely alleged that the chief operating officer and counsel carried out "the regular affairs of [the defendant], such as day-to-day financial operations, including the implementation and supervision of deceptive trading practices") (internal marks omitted); *Fla. Evergreen Foliage v. E.I. Dupont De Nemours & Co.,* 336 F. Supp. 2d 1239, 1261 (S.D. Fla. 2004) (discussing that the distinctiveness requirement was not met where an alleged "enterprise" consisted of corporation, employees, outside counsel, and agents and consultants); *Daigneault v. Eaton Corp.*, 2008 WL 2604929, at *3 (D. Conn. June 16, 2008) (holding that the plaintiff had failed to plead a RICO enterprise consisting of the defendant's employees and its legal defense team because "all of the employees and attorneys alleged to constitute the RICO enterprise were acting as employees or agents of [the defendant] when they allegedly committed mail or wire fraud"); *Acosta v. Campbell*, 2006 WL 146208, at *6 (M.D. Fla. Jan. 18, 2006) (law office and mortgage holders that engaged in debt collection activities following foreclosure on plaintiff's mortgage were not separate and distinct entities for purposes of RICO liability); *R.C.M. Executive Gallery Corp. v. Rols Capital Co.*, 1997 WL 27059, at *8

(S.D.N.Y. Jan. 23, 1997) (rejecting the plaintiffs' argument that the defendant partnership and its outside counsel formed an enterprise because the allegations showed only that the attorney represented the partnership with respect to its interests in the ordinary course of business). Moreover, Telebrands acted the only way it could in this precise context: through Snow, its registered patent attorney. *See generally In re Queen's Univ. at Kingston*, 820 F.3d 1287, 1295–1301 (Fed. Cir. 2016) (discussing the history of the congressionally prescribed power of the Patent Office to limit and regulate those who practice before it).

Second, Tristar attempts to distinguish *Ray* because the defendant there was a corporation, not a natural person. Tristar latches onto the *Ray* court's discussion of the Supreme Court's seminal *Cedrick Kushner* decision, in which it observed that "[w]hen an individual defendant acts through a corporation, he may have formed an association-in-fact with an entity distinct from himself." *Ray*, 836 F.3d at 1357 (discussing holding of *Cedric Kushner*). Read in isolation, this quote might appear to support Tristar's position. But, as with most things, context is critical, and there is no need to pause over this argument long.

In *Cedric Kushner*, the boxing promoter Don King allegedly conducted his business, Don King Productions, in a manner that violated RICO. Since Don King was the president and sole shareholder of his business, this seemed (at least

superficially) to present a distinctiveness issue.  The Supreme Court, however, held that RICO's "distinctiveness requirement is met where an individual defendant engages in a pattern of racketeering activity through a corporation, even a corporation of which the defendant is the sole shareholder."  *Ray*, 836 F.3d at 1356 (citing *Cedric Kushner*, 533 U.S. at 166).  Applying RICO in such circumstances, the Supreme Court reasoned, is consistent with the statute's purpose of protecting legitimate enterprises from becoming vehicles for an individual to commit illegal acts.  *See Cedric Kushner*, 533 U.S. at 164; *see also Ray*, 836 F.3d at 1356 ("RICO was designed—at least in part—to prevent an individual engaged in racketeering activities from increasing his power to do wrong by taking over an apparently legitimate firm.  Doing so allows that individual to 'use[] the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts than he could in his own person.'" (quoting *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997))).  Here, Snow is no Don King. There are zero allegations that Snow, in his capacity as outside counsel on patent matters, infiltrated and wangled control of Telebrands to perpetrate his criminal aims under the veneer Telebrands' normal business operations.  The Court therefore finds that, for purposes of RICO, Snow and Telebrands are one and the same and cannot satisfy RICO's distinctiveness requirement.

Relatedly, Snow argues that the RICO claim against him in his individual capacity should be dismissed because the Complaint does not plausibly allege that he "operated or managed" the putative enterprise. *See Reves v. Ernst & Young*, 507 U.S. 170, 183, 185–86 (1993) (holding that, in addition to establishing the presence of an enterprise, a plaintiff must establish that the named defendant participated in operating or managing the enterprise itself to impose RICO liability). The Court agrees. "[C]ourts have held that merely providing standard legal services will not subject an attorney to RICO liability, even where the attorney's services furthered the enterprise's goal or where the attorney knew of the illicit nature of the enterprise's affairs." *See Drummond v. Zimmerman*, 454 F. Supp. 3d 1210, 1219 (S.D. Fla. 2020) (collecting cases); *see also RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1051 & n.7 (D.C. Cir. 2012) (affirming dismissal because "the allegations of the complaint target[ed] [the defendant's] services as attorneys, nothing more," and observing that "the circuit courts of appeals have declined to extend RICO liability under § 1962(c) to an attorney's provision of routine legal services") (collecting cases). Tristar primarily relies on *Handeen v. Lemaire*, 112 F.3d 1339 (8th Cir. 1997), in support of its argument that Snow's actions exposed him to RICO liability. But that case stands for the unremarkable proposition that individuals who just so happen to be attorneys

CASE NO. 3:24-cv-238-MCR-HTC

are still subject to RICO's proscriptions. *Id.* at 1349 ("An attorney's license is not an invitation to engage in racketeering, and a lawyer no less than anyone else is bound by generally applicable legislative enactments . . . . The polestar is the activity in question, not the defendant's status [as an attorney].").  The *Handeen* court, however, cautioned that it would require extraordinary actions on the part of an attorney to be found liable under RICO for providing legal services.  *Id.* ("It is a good thing, we are sure, that we find it extremely difficult to fathom any scenario in which an attorney might expose himself to RICO liability by offering conventional advice to a client or performing ordinary legal tasks (that is, by acting like an attorney).").  Again, Snow is alleged to have acted no more than as an attorney, and therefore the Complaint has likewise failed to allege that he operated or managed any putative enterprise.

### c.    Pattern

Moreover, even if Telebrands and Snow could properly be considered a RICO enterprise or to have committed two predicate acts of wire fraud, Tristar fails to allege a pattern of racketeering activity.  RICO only applies to long-term, habitual criminal activity—not isolated or sporadic episodes.  *See Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1265 (11th Cir. 2004) (noting that "the sort of offense that RICO is designed to address" is "one that is part of a pattern of ongoing,

continuing criminality"); *see also Fitzgerald*, 116 F.3d at 226 (RICO is not a surrogate for fraud actions properly brought under state law).  So, to fall within RICO's ambit, Tristar must plead either (i) closed-ended continuity, which is a series criminal conduct that existed for such a substantial period of time that a threat of future harm is implicit; or (ii) open-ended continuity, which is a series of criminal conduct that, while short-lived, clearly threatens to continue into the future.  *See H.J. Inc.*, 492 U.S. at 242 (plaintiffs can plead a pattern of racketeering activity by alleging "a series of related predicates extending over a substantial period of time" or "the threat of continuity").

Tristar wisely renounces any reliance on closed-ended continuity, *see* ECF No. 45 at 31, as the Eleventh Circuit has repeatedly counseled "that the *substantial* period of time requirement for establishing closed-ended continuity cannot be met with allegations of schemes lasting less than a year," *Jackson*, 372 F.3d at 1266 (emphasis in original) (collecting cases), and the racketeering alleged here took place over just three months.  *See also Cisneros*, 972 F.3d at 1216 ("We measure a 'substantial period of time' in years, not in weeks.").[25]

---

[25] Further, RICO claims premised on "independently chargeable instances of mail or wire fraud cannot constitute a [closed-ended] 'pattern of racketeering activity' when they arise from a single transaction." *Cisneros*, 972 F.3d at 1216.  Tristar's allegations, at most, amount to multiple acts of wire fraud relating to a single episode of fraud, which cannot satisfy RICO's requirement that the alleged fraudulent acts evince a pattern of long-term criminal activity. *See id.* ("[T]o hold

That leaves all of Tristar's eggs in the open-ended continuity basket. Tristar stops short of arguing that "the alleged acts [are] part of [Telebrands' and Snow's] regular way of doing business," *Jackson*, 372 F.3d at 1267 (internal marks omitted), but contends that the putative Telebrands-Snow enterprise's "illegal acts [still] threaten[] repetition in the future." *Id.* (noting that these are the two ways a plaintiff may plausibly allege open-ended continuity). The threat of future racketeering, Tristar claims, is manifested in Telebrands' continued prosecution of its patent infringement claims and intention to seek attorney's fees against Tristar in certain co-pending cases. The problem, though, is that those litigation activities tell us next to nothing about whether Telebrands and Snow would ever engage in analogous (allegedly fraudulent) schemes before the Patent Office in the future. *See H.J. Inc.*, 492 U.S. at 240 (predicate acts are "related" when they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events" (citation omitted)).[26] And, to be sure, the mere fact that the Patent Office's *ex parte*

---

otherwise could make RICO cases out of one allegedly fraudulent transaction. That would contravene the clear purpose of RICO."); *see also Efron v. Embassy Suites (P.R.), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000) ("RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.").

[26] Nor can those litigation happenings, or any statements made by Telebrands or Snow during the course of the co-pending litigations, constitute RICO predicate offenses in their own

reexamination procedures remain available to Telebrands and Snow in the future is no panacea.  *Cf. LCS Grp.*, 2019 WL 1234848, at *12 (holding that allegedly fraudulent patent reexamination scheme "is inherently terminable and, as such, cannot constitute an open-ended pattern of RICO violations"); *Lockwood*, 2009 WL 9419499, at *5 ("Plaintiffs cannot use the reexamination statutes, which allow '[a]ny person at any time' to file a reexamination request, to transform Defendants' two reexamination requests . . . into an open-ended pattern of racketeering activity.").

At most, Tristar has alleged a scheme with a clear and terminable goal that has already reached its natural ending point.  Nothing in the Complaint suggests that Telebrands or Snow would ever repeat the alleged course of conduct.

### d.    Causation

Tristar also cannot show that Telebrands' and Snow's alleged conduct caused its injuries as a matter of law.  RICO provides a cause of action for "[a]ny person

---

right.  *See Raney*, 370 F.3d at 1087–88 (holding that litigation activities do not ordinarily provide a basis for a RICO predicate offense and noting that "courts possess adequate procedures to distinguish valid claims from invalid claims and . . . Congress did not intend to punish citizens merely for accessing the legal system"); *see also Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) (concluding "that allegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act") (collecting cases); *cf. Chance v. Cook*, 50 F.4th 48, 51–52 (11th Cir. 2022) (noting that there are no "free pass[es] [given] to attorneys who engage in less-than-ethical conduct on behalf of their clients," but that conduct should be brought to the attention of the court overseeing the underlying case, which retains the power and authority to control and discipline attorneys, rather than bringing a subsequent obstruction of justice claim in a different court).

injured in his business or property *by reason of* a violation of section 1962." 18 U.S.C. § 1964(c) (emphasis added).  While Tristar is not required to show direct, first-party reliance on the putative Telebrands-Snow enterprise's statements, *see Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008), some showing of proximate cause is still required to proceed on a RICO claim, *see Ray*, 836 F.3d at 1349.  *See also Beck v. Prupis*, 162 F.3d 1090, 1096 (11th Cir. 1998) ("A factor is a proximate cause if it is a substantial factor in the sequence of responsible causation." (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994))).

The Patent Office—not Telebrands or Snow—made the ultimate, independent decision to cancel the '448 Patent, '076 Patent, '944 Patent, and '057 Patent.  *See Cuozzo*, 579 U.S. at 267 ("For several decades, the Patent Office has . . . possessed the authority to reexamine—and perhaps cancel—a patent claim that it had previously allowed."); *In re Swanson*, 540 F.3d at 1375 ("Congress intended reexaminations to provide an important 'quality check' on patents that would allow *the government* to remove defective and erroneously granted patents.") (emphasis added); *see also Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471, 1482 (Fed. Cir. 1986) ("The mere fact that [a patent applicant] attempted to distinguish [its claim] from the prior art does not constitute a material omission or misrepresentation. The examiner was free to reach his own conclusion regarding the

[claim] based on the art in front of him.").[27]   Telebrands and Snow could not

"voluntarily" cancel these patent claims, as Tristar suggests, by simply telling the

Patent Office that Telebrands was the assignee.  *See* ECF No. 1 at ¶ 114.  They were

entitled to no more than to "propose" amendments, 35 U.S.C. § 305, that the Patent

Office could then accept or reject.  *Id.* at § 307 ("In a reexamination proceeding

under this chapter. . . the Director will issue and publish a certificate canceling any

claim of the patent finally determined to be unpatentable . . . .").[28]  Tristar's RICO

claim fails for this reason as well.  *See Lockwood*, 2009 WL 9419499, at *6 ("[T]he

[Patent Office's] duty to conduct an independent investigation into the merits of

Defendants' reexamination requests negates proximate cause."); *cf. Cordoba v.*

---

[27] The proximate cause inquiry here is very different compared to other instances in which fraud on the Patent Office is potentially actionable: (i) when a party seeks to impose antitrust liability based on the Supreme Court's decision in *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965); and (ii) when a defendant asserts inequitable conduct in response to a patent infringement action, *see Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011).  The genesis of both instances stem, not from any action by the Patent Office, but instead from the patentee's enforcement of the fraudulently procured patent.  *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1358 (Fed. Cir. 2004), *rev'd on other grounds,* 546 U.S. 394 (2006) ("[I]f the patentee has done nothing but obtain a patent in a manner that the plaintiff believes is fraudulent, the courts lack jurisdiction to entertain either a Declaratory Judgment Action or a *Walker Process* claim."); *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070 (Fed. Cir. 1998) ("Inequitable conduct is thus an equitable defense in a patent infringement action and serves as a shield . . . .").

[28] This stands in stark contrast to a patentee's ability to unilaterally cancel patent claims by statutory disclaimer.  *See* 35 U.S.C. § 253 (providing that a patentee may "disclaim or dedicate to the public" a patent); *Guinn v. Kopf*, 96 F.3d 1419, 1422 (Fed. Cir. 1996) ("A statutory disclaimer under 35 U.S.C. § 253 has the effect of canceling the claims from the patent and the patent is viewed as though the disclaimed claims had never existed in the patent.").

*DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019) ("[A]n injury is not fairly traceable to the actions of a defendant if [it is] caused by the 'independent action of some third party not before the court.'" (quoting *Swann v. Secretary*, 668 F.3d 1285, 1288 (11th Cir. 2012))).[29]

### e.    The *Noerr-Pennington* Doctrine

Although, as discussed extensively above, the Court finds that well-settled RICO principles require Tristar's claims to be dismissed, the Court alternatively concludes that the *Noerr-Pennington* doctrine bars them as well. *See generally E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657 (1965). The *Noerr-Pennington* doctrine, which initially appeared in the antitrust sphere, recognizes that petitioning the government, whether through the legislature, the executive, or the courts, is protected by the First Amendment and, when possible, statutes should not be construed to cover that activity. *See Sosa*, 437 F.3d at 933–42 (applying the

---

[29] Moreover, it's downright implausible that the Patent Office had the wool pulled over its eyes here. As alleged in the Complaint, Tristar informed the Patent Office of the very same misrepresentations it alleges in this case *before* the Patent Office issued the certificates cancelling the patents. *See* ECF No. 1 at ¶ 111. Although the filings were expunged, the Patent Office still had ample authority at that point to take into account Tristar's factual and legal assertions before taking action. *See, e.g.*, 37 C.F.R. § 1.313(a) (providing that the Patent Office may on its own initiative withdraw an application from issue for any reason, which would include a violation of the duty to disclose information material to patentability); *see also* MPEP § 1308.

*Noerr-Pennington* doctrine to RICO claims); *Int'l Bhd. of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999) (same). The Eleventh Circuit, along with eight other courts of appeals, recognize an exception to *Noerr-Pennington* immunity when a petitioner makes misrepresentations during an adjudicative proceeding. *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 955 (11th Cir. 1986) (finding that misrepresentations to a governmental body "acting judicially" do not enjoy *Noerr-Pennington* immunity); *see also In re Merck Mumps Vaccine Antitrust Litig.*, 2024 WL 4432076, at *10 n.2 (3d Cir. Oct. 7, 2024) (Shwartz, J., dissenting) (collecting cases). But to fall outside of the *Noerr-Pennington* doctrine's protection in this context, the misrepresentation must have been (1) "intentionally made, with knowledge of its falsity;" and (2) "material, in the sense that it actually altered the outcome of the proceeding." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 843 (7th Cir. 2011). Even assuming, for the sake of argument, that the Patent Office was "acting judicially," *St. Joseph's Hosp.*, 795 F.2d at 955, this exception does not apply for the reasons stated above; as pleaded, Telebrands and Snow had an objective basis for believing that Telebrands was the lawful assignee, and Tristar's conclusory and unpersuasive assertions of wrongdoing do not suggest otherwise. Nor were these alleged misrepresentations material in the sense that they

"deprived the entire . . . proceeding of its legitimacy."  *Kottle v. Nw. Kidney Ctrs.*,

146 F.3d 1056, 1062–63 (9th Cir. 1998).

## 2.  Count X:  The Clayton Act (Against Telebrands and Snow)[30]

Next up, the Clayton Act.[31]  Tristar alleges that Telebrands' conduct before

the Patent Office has "effectively extinguished [its] rightful monopoly" in the

---

[30] Again, since the filing of the Complaint, Tristar has abandoned its attempted monopolization claim against Snow.

[31] Section 12 of the Clayton Act includes both a venue provision and a nationwide service-of-process provision:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business ["venue provision"]; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found ["nationwide service-of-process provision"].

15 U.S.C. § 22.  There is an ongoing circuit split regarding whether the venue and service-of-process provisions must be read together or separately, and as of the date of this Order, the Eleventh Circuit has not reached this issue.  The majority view—championed by the Second, Seventh, and D.C. Circuits—holds that "[t]he extraterritorial service provision of Clayton Act Section 12 may be invoked to establish personal jurisdiction only when the requirements of the section's venue provision are satisfied."  *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 424–25 (2d Cir. 2005); *see also KM Enters., Inc. v. Global Traffic Techs., Inc.*, 725 F.3d 718, 730 (7th Cir. 2013); *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000).  The minority view—endorsed by the Ninth and Third Circuits—holds that, "under Section 12 of the Clayton Act, the existence of personal jurisdiction over an antitrust defendant does not depend upon there being proper venue in that court."  *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1179–80 (9th Cir. 2004); *see also In re Automotive Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 296–97 (3d Cir. 2004).  The Court need not take a side in this debate, however, because Tristar has plausibly alleged that Telebrands "transacts business" in this District.  *See* ECF No. 1 at ¶ 8; *cf. Black v. Acme Markets, Inc.*, 564 F.2d 681, 687 (5th Cir. 1977) (court must judge whether a defendant transacts substantial business in a district "from the point of view of the average businessman and not in proportion to the sales or revenues of the defendant."); *see generally Iqbal*, 556 U.S. at 679 (observing that courts are entitled to draw on their "judicial experience and common sense" when evaluating a complaint).

putative market for "expandable and retractable hoses," imposing "tens, if not hundreds, of millions of dollars" in damages on Tristar in violation of § 2 of the Sherman Act. *See* ECF No. 1 at ¶ 116.

Section 4 of the Clayton Act (which amended the Sherman Act) grants private parties, such as Tristar, the power to enforce federal antitrust laws. *See* 15 U.S.C. § 15(a). To perform the role of "private attorney[] general," *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 262 (1972), Tristar must demonstrate not only that it has standing under Article III of the Constitution, but also that it has "antitrust standing." *See Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1448 (11th Cir. 1991). This is a threshold bar that all private antitrust plaintiffs must clear. Courts analyze antitrust standing using a two-pronged test. *Id.* at 1449. First, Tristar must plausibly allege that it suffered an "antitrust injury." *Id.* Second, Tristar must be an "efficient enforcer" of the antitrust laws. *Id.* at 1450.[32]

---

[32] Courts usually consider six factors in determining whether a plaintiff would be an efficient enforcer of the antitrust laws: (1) whether the plaintiff has suffered a direct injury; (2) whether its injury is remote; (3) whether other plaintiffs are better suited to bring the suit; (4) whether the plaintiff's injuries are speculative; (5) whether the calculation of damages would be complex and run the risk of duplicative recoveries; and (6) whether the plaintiff could enforce the court's judgment. *See Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1271 (11th Cir. 2013) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538–45 (1983)).

Antitrust injury is a different beast than your garden variety injury-in-fact inquiry. *See Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1299 (11th Cir. 2010) ("To have antitrust standing, a party must do more than meet the basic 'case or controversy' requirement that would satisfy constitutional standing"). To survive dismissal, Tristar must plausibly allege that Telebrands' conduct both injured its business *and* will harm competition—in other words, that consumers will be made worse off by the things that make monopolies objectionable: higher prices, reduced output, or diminished quality. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."); *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389–90 (11th Cir. 1990) (antitrust injury requirement ensures that the plaintiff, although motivated by private interests, is seeking to vindicate an injury to the public that the antitrust laws were designed to prevent); *Chicago Professional Sports Ltd. v. Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992) (antitrust injury doctrine "requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers"); *see also Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1339 (11th Cir. 2010) ("Actual anticompetitive effects include, but are not limited to, reduction of output, increase

in price, or deterioration in quality."). This is because the antitrust laws were enacted for the "the protection of competition, not competitors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962); *see Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws."); *see also Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) ("[A] producer's loss is no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other.").

Tristar's beef is that Telebrands allegedly stole its "rightful" monopoly in the putative market for "expandable and retractable hoses" through unlawful and fraudulent acts, placing Telebrands on the precipice of achieving "wrongful" monopoly power in that same market. *See* ECF No. 1 at ¶ 116.

Monopoly-for-me-not-for-thee claims like this are dead on arrival. *See* Herbert Hovenkamp, *Federal Antitrust Policy* 663 (4th ed. 2011) ("[I]f the plaintiff's only claim is of the nature 'I, rather than the defendant, was entitled to be the monopolist,' then the plaintiff is not a victim of antitrust injury."). A plaintiff does not suffer an antitrust injury when its monopoly power merely shifts to different hands—even if effected through unsavory methods. *See Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1076 (11th Cir. 2004) ("'The

use of unfair means resulting in the substitution of one competitor for another without more does not violate the antitrust laws.'" (quoting *Mfg. Research Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1043 (11th Cir. 1982))); *Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, 353 (5th Cir. 1980) (no antitrust injury because the "mere substitution" of an electricity reseller for the electric company selling directly to consumers did not affect competition) (internal marks omitted); *Redwing Carriers, Inc. v. McKenzie Tank Lines, Inc.*, 594 F.2d 114, 115 (5th Cir. 1979) (no antitrust injury when challenged conduct simply transferred monopoly power from one entity to another).[33]  The logic here is straightforward: although the replaced monopolist is harmed, the level of competition in the market remains the same; regardless of which entity holds the monopoly, it is free to limit output or raise prices.  *See Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266–67 (7th Cir. 1984) (one monopolist replacing another "is a matter of indifference" to the antitrust laws, as either monopolist can equally "exploit[] a monopoly"); *cf. Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr.*, 582 F.3d 1216, 1226 (10th Cir. 2009) (finding no antitrust injury because even though a

---

[33] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

plaintiff "might be better off with such a shared monopoly, . . . there's no guarantee consumers would be") (Gorsuch, J.).

The Seventh Circuit's decision in *Riegel Textile* is illustrative.  In that case, two corporations disputed the rightful ownership of a patent over a process for manufacturing antistatic yarn.  752 F.2d at 264.  The plaintiff alleged that the defendant had procured the patent by fraud and sued under § 2 of the Sherman Act for attempted monopolization and conspiracy to monopolize.  *Id.*  But Judge Posner, writing for the Seventh Circuit, found that "[t]he theft of a perfectly valid patent . . . . [has] *no antitrust significance*," as the plaintiff could not establish that it suffered an antitrust injury.  *Id.* at 266 (emphasis added).  Judge Posner observed that regardless of who rightfully owned the patent, "the power over price that patent rights confer is . . . no greater than it otherwise would be just because the person exercising the rights is not the one entitled by law to do so." *Id.* at 265; *see also id.* at 268 ("It would seem to follow that if a form of wrongdoing (stealing a patentable process) *cannot cause antitrust injury to anyone*, because it has no tendency to raise prices or reduce output or do anything else that hurts consumer or other interests protected by the antitrust laws, it does not violate those laws at all.") (emphasis added).

The principles that animated Judge Posner's opinion decades ago are equally applicable today. Here, too, the Court "cannot find the consumer interest in this case. [Tristar] is complaining not because [Telebrands] is gouging the consumer by charging a monopoly price for [expandable and retractable hoses], but because [Telebrands allegedly] took away a monopoly that rightfully belonged to [Tristar] as the real [holder of RTC's patent rights]." *Id.* at 267.[34]

Accordingly, Tristar's attempted monopolization claim must be dismissed. *See Fla. Seed Co. v. Monsanto Co.*, 105 F.3d 1372, 1375 (11th Cir. 1997) (if antitrust injury is absent, courts need not address whether plaintiff is an efficient enforcer of the antitrust laws).[35]

---

[34] Tristar's attempted monopolization theory is perhaps most notable for what it is not: a *Walker Process* fraud claim. *See* 382 U.S. at 174 (stating "enforcement of a patent procured by fraud" may violate the Sherman Act). *Walker Process* fraud is an exception to the usual rule that a patent holder cannot incur antitrust liability for enforcing its patent. *See Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1346-47 (Fed. Cir. 2007). Among other things, it requires a challenger to show that the patent allegedly procured by fraud "would not have issued *but for* the patent examiner's justifiable reliance on the patentee's misrepresentation or omission." *Dippin' Dots*, 476 F.3d at 1347 (emphasis added). Tristar's claim is quite different. In Tristar's eyes, the problem is not that the RTC patents were issued in the first place, it's that Telebrands swindled them away from Tristar's stewardship through fraud later on. That theory, as noted above, does not sound in antitrust law.

[35] The Court also observes that Tristar's attempted monopolization claim is independently subject to dismissal because, while it avers a relevant product market, it is silent on the relevant geographic market. *See Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1263 (11th Cir. 2015) ("The relevant market has two components, and the plaintiff must define both the geographic market and the product market in which the defendant allegedly possesses increasing power. The relevant geographic market is the area of effective competition in which a product or its reasonably interchangeable substitutes are traded." (citation and internal marks

### 3.    Leave to Amend

Despite Tristar's blanket request for leave to amend, the Court will dismiss Tristar's RICO and antitrust claims with prejudice.  "Generally, where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the court dismisses the action with prejudice." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (internal marks omitted and alteration accepted).  But the flaws with Tristar's federal claims outlined above are not technical pleading deficiencies.  Viewed as a whole, they eliminate any chance that Tristar could amend its Complaint to state a meritorious RICO claim.  *See Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999) (denial of leave to amend is justified if an amendment would be futile); *Green v. Fiveash*, 2019 WL 8063986, at *2 (N.D. Fla. June 28, 2019) ("A district court may, in the exercise of its inherent power to manage the conduct of litigation before it, deny such leave where there is substantial ground for doing so, such as undue delay, bad faith or dilatory motive on the part of the movant . . . undue prejudice to the opposing party

---

omitted)); *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1369 (Fed. Cir. 2002) ("Defining the relevant market is indispensable . . . ." (internal marks omitted)).  If that were the only defect, however, the Court likely would have granted leave to amend.  *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010) ("Although the parameters of a given market are questions of fact, antitrust plaintiffs still must present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." (internal marks omitted)).

CASE NO. 3:24-cv-238-MCR-HTC

by virtue of allowance of the amendment, [and] futility of amendment." (quoting *Reese v. Herbert*, 527 F.3d 1253, 1263 (11th Cir. 2008) (other internal marks omitted)).    And Tristar's monopoly-for-me-not-for-thee theory rules out any prospect that Tristar could amend the Complaint to plausibly allege that its injury coincides with the putative harms felt by consumers.  *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986) ("A showing of antitrust injury is necessary . . . to establish standing under § 4 [of the Clayton Act]"); *Spanish Broad.*, 376 F.3d at 1079 (affirming dismissal with prejudice when plaintiff failed to plausibly allege an antitrust injury and instead relied on "vague statements about the potential general consequences of hypothetical monopolization of the [relevant] market").  Because any retooled RICO or attempted monopolization claim would meet an identical fate, the Court will not permit Tristar to amend and finds that dismissal with prejudice is appropriate.

## B.    State Law Claims:  Florida's Long-Arm Statute

Having dispensed with Tristar's federal causes of action, pendent personal jurisdiction is off the table.  The Court therefore looks to whether it may properly exercise personal jurisdiction over Defendants based solely on Tristar's remaining state law claims.  Federal courts exercise personal jurisdiction over nonresident defendants to the same extent as Florida courts, provided the exercise of jurisdiction

is consistent with due process. *See Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008). Tristar, as the plaintiff, bears the burden of establishing a *prima facie* case of personal jurisdiction over Telebrands, Snow, and Perch. *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268–69 (11th Cir. 2002). The Court's inquiry is two-fold. *See PVC Windoors, Inc. v. Babbitbay Constr., N.V.*, 598 F.3d 802, 807 (11th Cir. 2010). First, the Court must "determine whether the [Florida] long-arm statute provides jurisdiction." *Id.* Next, "[o]nly where the long-arm statute provides jurisdiction [does the Court] proceed to the second step and determine whether the defendant has minimum contacts with the forum state and, if it does, whether the district court's exercise of jurisdiction over that defendant would offend traditional notions of fair play and substantial justice." *Id.* (internal marks omitted and alteration accepted).[36]

Florida's long-arm statute, Fla. Stat. § 48.193, provides two forms of personal jurisdiction: specific and general. *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018). Although the Complaint alleges, in conclusory fashion, that general jurisdiction exists over each of the Defendants, Tristar has not argued that it

---

[36] If it came to it, Defendants would bear the burden of "mak[ing] a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Louis Vuitton*, 736 F.3d at 1355 (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010)).

applies.[37]    Consequently, the Court's inquiry is trained on specific jurisdiction. Specific jurisdiction is available when the cause of action arises out of an act enumerated in Florida's long-arm statute and committed within the state of Florida or, alternatively, directed at Florida residents or property within the state.  *See* Fla. Stat. § 48.193(1)(a).  Tristar alleges that Telebrands, Snow, and Perch committed tortious acts that were directed at, and caused injury in, Florida sufficient to create a jurisdictional nexus under the long-arm statute.  *Id.* at § 48.193(1)(a)2.

In Florida, however, "before a court addresses the question of whether specific jurisdiction exists under the long-arm statute, the court must determine 'whether the allegations of the complaint state a cause of action.'"  *PVC Windoors, Inc.*, 598 F.3d at 808 (quoting *Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002)).[38]  Therefore,

---

[37] The general jurisdiction provision of Florida's long-arm statute provides jurisdiction over any claims against "[a] defendant who is engaged in substantial and not isolated activity within [Florida]."  Fla. Stat. § 48.193(2).  Section 48.193(2)'s "substantial and not isolated activity" requirement is "the functional equivalent of the continuous and systematic contact requirement for general jurisdiction under the Fourteenth Amendment" to the Constitution.  *Meier*, 288 F.3d at 1269 n.6.  To be sure, general jurisdiction is unavailable here.  All-purpose jurisdiction is typically available only where the defendant is incorporated or maintains its principal place of business.  *See Daimler AG v. Bauman*, 571 U.S. 118, 137 (2014).  Neither basis is alleged for any Defendant.

[38] Although this may seem backwards to some in light of the Eleventh Circuit's instruction that "courts should address issues relating to personal jurisdiction before reaching the merits of a plaintiff's claims," *Republic of Panama*, 119 F.3d at 940, the Court is bound to construe Florida's long-arm statute as the Florida Supreme Court has (and would) because its construction and interpretation raise questions of Florida law.  *See SkyHop Techs.*, 58 F.4th at 1223.

the Court turns to the question of whether Tristar's state law claims are subject to dismissal under Rule 12(b)(6).

### 1.   Choice-of-Law

One last pitstop before reaching the merits of Defendants' arguments for dismissal. The Complaint brings claims for tortious interference, conspiracy, and fraud under both New Jersey and Florida common law based on the same underlying facts. Telebrands and Snow argue that Tristar's claims arising under New Jersey law should be dismissed as improperly duplicative, because asserting them is a thinly veiled attempt to sidestep the choice-of-law analysis that courts routinely employ to determine which state's substantive law applies. *See Strassman v. Essential Images*, 2018 WL 5718286, at *6 (M.D. Pa. Nov. 1, 2018) ("The choice of law analysis is meant to prevent plaintiffs from simply litigating their claims under the laws of multiple states in the hope that the application of one of those laws will result in a favorable outcome"). Tristar, for its part, contends that it should be permitted to maintain its state law claims under both New Jersey and Florida law at this early stage of the litigation.

Neither side, however, identifies an outcome-determinative conflict (or any conflict for that matter) between Florida and New Jersey law on the claims presented in this case. *See James River Ins. Co. v. Arlington Pebble Creek, LLC*, 188 F.

Supp. 3d 1246, 1254 (N.D. Fla. 2016) (courts needn't resolve "false conflict[s], which "exist[] when the laws of different states are (1) the same, (2) different but would produce the same outcome under the facts of the case, or (3) when the policies of one state would be furthered by the application of its laws while the policy of the other state would not be advanced by the application of its laws.") (citation omitted). The Court will accordingly apply Florida law to Tristar's state law claims.  *See Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 & n.21 (11th Cir. 1995) (holding that when there is no difference in the substantive law of the competing states, courts may avoid the conflicts question and "simply apply the law of the forum state," which carries the attendant "virtues of being more streamlined and less time-consuming" than applying both of the competing state laws).

### 2.    Counts I & II:  Tortious Interference (Against Telebrands)

Tristar's first state law claim alleges that Telebrands tortiously interfered with its longstanding exclusive licensing arrangement with RTC, causing its termination in August 2022.  In Florida, the elements of tortious inference with contractual relations are: (i) the existence of a contract; (ii) the defendant's knowledge of the contract; (iii) the defendant's intentional procurement of the contract's breach; (iv) absence of any justification or privilege; and (v) damages resulting from the breach. *Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1322 (11th

Cir. 1998) (citing *Fla. Tel. Corp. v. Essig*, 468 So. 2d 543, 544 (Fla. 5th DCA 1985)).

The first, second, and fifth elements are not in dispute. But Telebrands argues that

the Complaint fails to sufficiently allege that it had anything to do with inducing

RTC's alleged breach or that it employed wrongful means, as opposed to lawful

competitive practices, to ultimately secure the patent assignment from RTC.

The Court, even drawing all inferences in favor of Tristar, cannot find that the

Complaint has alleged sufficient facts to plausibly state a claim for tortious

interference with a contractual relationship. A careful review of the Complaint

reveals that the *only* allegation that Telebrands negotiated with RTC *before* it

terminated its arrangement with Tristar (such as to make it possible that Telebrands'

conduct could have induced the putative breach) is made solely "upon information

and belief"—a phrase that Telebrands notes was used nearly 50 times in the

Complaint. *See* ECF No. 1 at ¶ 56 ("Upon information and belief, prior to August

11, 2022, Telebrands actively negotiated with RTC . . . ."). That lonely allegation is

not entitled to a presumption of truth, *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th

Cir. 2013), and there are no *facts* in the Complaint to support it. *See Source One

Fin. Servs., LLC v. Corpodian*, 2024 WL 4441804, at *3 (S.D. Fla. Oct. 8, 2024)

("Allegations based solely on 'information and belief' are insufficient . . . unless

they are accompanied by supporting facts that make the claim plausible" (quoting

*Scott v. Experian Info. Sols., Inc.*, 2018 WL 3360754, at *6 (S.D. Fla. June 29, 2018))); *see also Phoenix Entm't Partners, LLC v. Orlando Beer Garden, Inc.*, 2016 WL 1567590, at *5 (M.D. Fla. Mar. 30, 2016) ("Conclusory allegations made upon information and belief are not entitled to a presumption of truth, and allegations stated upon information and belief that do not contain any factual support fail to meet the *Twombly* standard."). Indeed, the earliest-in-time fact connecting Telebrands to RTC charted out in the Complaint is that the two signed an exclusive licensing agreement on October 25, 2022—over two months *after* RTC terminated its arrangement with Tristar. *See* ECF No. 1 at ¶ 57. The dearth of specific factual allegations as to Telebrands stands in marked contrast to the numerous pre-termination facts allegations related to Perch, which for the reasons discussed next, cannot be imputed to Telebrands as things currently stand. *See, e.g., id.* at ¶ 52 (discussing how, prior to RTC's August 2022 termination notice, Perch exchanged a draft licensing agreement with RTC).[39]

Stripped of legal conclusions and conjecture, Tristar's tortious interference claim is a speculative theory in search of facts to support it. That cannot pass muster

---

[39] In May 2024, the district court overseeing Tristar's lawsuit against Perch allowed a similar tortious interference claim, brought under Massachusetts law, to proceed to discovery. *Perch*, 1:22-cv-11301-DJC, ECF No. 52 (D. Mass. May 20, 2024). Crucial to the district court's reasoning, however, was the allegation that Perch had been negotiating with RTC prior to the termination of the exclusive licensing arrangement and that the two planned to "concoct"

under Rule 12(b)(6). *See Twombly*, 550 U.S. at 555 (dismissal under Rule 12(b)(6) is appropriate when a plaintiff fails to allege facts sufficient "to raise a right to relief above the speculative level").

Counts I and II will be dismissed without prejudice to provide Tristar with the opportunity to address, if possible, this shortcoming.[40]

### 3.   Counts III & IV:   Conspiracy (Against Telebrands and Perch)

Tristar also alleges that, despite being competitors in their own right, Telebrands and Perch conspired to unlawfully interfere with its exclusive license

---

arguments to justify its termination. *Id.* Admittedly, the latter allegation was made "upon information and belief" in that case as well, but a key distinguishing feature of that complaint was the allegation that Perch—without qualification—negotiated with RTC *before* RTC terminated the exclusive licensing arrangement. The Complaint here contains no such allegation as to Telebrands.

[40] For the sake of expediency, the Court will not hide the ball on Telebrands' remaining argument for dismissal: that any putative interference was executed solely through lawful competitive practices, not any improper conduct. *See* ECF No. 29 at 13. If Tristar plausibly alleged *facts* evincing that (i) Telebrands had negotiated with RTC prior to its decision to terminate the exclusive licensing arrangement with Tristar; and (ii) Telebrands' represented to RTC—during the course of those pre-termination negotiations—that RTC's right to recover or pursue its existing patent infringement claims would be unaffected by an assignment of its patent rights to Telebrands, that would likely be sufficient to state a plausible claim for tortious interference. *See Bluesky Greenland Env't Sols., LLC v. 21st Century Planet Fund, LLC*, 985 F. Supp. 2d 1356, 1367 (S.D. Fla. 2013) (defendants lose the protection of the "competition privilege" when they employ "improper means," such as "physical violence, misrepresentations, intimidation, conspiratorial conduct, illegal conduct and threats of illegal conduct" (citing *G.M. Brod & Co. v. U.S. Home Corp.,* 759 F.2d 1526 (11th Cir.1985)); *see also Boldstar Tech. LLC v. Home Depot,* 517 F.Supp.2d 1283, 1289–90 (S.D. Fla. 2007) (observing that the improper means of "misrepresentations" may include a false statement or omission of material fact); Restatement (Second) of Torts § 767 cmt. c. ("A representation is fraudulent when, to the knowledge and belief of its utterer, it is false in the sense in which it's intended to be understood by the recipient."). Be that as it may, for this Court to exercise personal jurisdiction over Telebrands, Tristar must still

arrangement with RTC.  Under Florida law, the Complaint must plausibly allege "[i] an agreement between two or more parties, [ii] to do an unlawful act or to do a lawful act by unlawful means, [iii] the doing of some overt act in pursuance of the conspiracy, and [iv] damage to plaintiff as a result of the acts done under the conspiracy."  *Mazer*, 556 F.3d at 1271 (quoting *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008)).

The Complaint is devoid of any facts from which the Court could plausibly infer any such agreement between Telebrands and Perch.[41]  Tristar does not allege any direct evidence of an agreement.  *Cf. In re Baby Food Antitrust Litig.*, 166 F.3d

---

allege that Telebrands sent some kind of telephonic, electronic, or written communication into Florida related to that alleged misrepresentation to fall within the reach of Florida's long-arm statute's tortious act prong.  *See N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, 124 F.4th 1322, 1337 (11th Cir. 2025); *cf. Dvoinik v. Rabl*, 2024 WL 4456270, at *1 (11th Cir. Oct. 10, 2024) (per curiam) ("But the fact that a tortious act causes an injury in Florida, standing alone, 'is insufficient to support jurisdiction over an out-of-state tortfeasor.'" (quoting *Kountze v. Kountze*, 996 So. 2d 246, 252 (Fla. 2d DCA 2008))).  Tristar's current pleading is silent on this score too.

[41] When a conspiracy to commit a tortious act against the plaintiff in Florida and an act in furtherance of it by any conspirator are successfully alleged, then all conspirators are subject to Florida's long-arm jurisdiction.  *See Execu-'Tech Bus. Sys v. New Oji Paper Co.*, 752 So. 2d 582, 585 (Fla. 2000); *Wilcox v. Stout*, 637 So. 2d 335, 337 (Fla. 2d DCA 1994); *see also Mazer*, 556 F.3d at 1281–82 (Florida's "long-arm statute can support personal jurisdiction over any alleged conspirator where any other co-conspirator commits an act in Florida in furtherance of the conspiracy, even if the defendant whom personal jurisdiction is sought individually committed no act in, or had no relevant contact with, Florida").  The coconspirator theory of jurisdiction, however, is inapplicable "if the plaintiff fails to plead with specificity any facts supporting the existence of the conspiracy and provides nothing more than vague and conclusory allegations regarding a conspiracy involving the defendants."  *NHB Advisors, Inc. v. Czyzyk*, 95 So.3d 444, 448 (Fla. 4th DCA 2012).

112, 118 (3d Cir. 1999) ("Direct evidence in [an antitrust conspiracy case] must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.").  And while "[t]he existence of a conspiracy and each individual's participation in it may be inferred from circumstantial evidence," *Donofrio v. Matassini*, 503 So. 2d 1278, 1281 (Fla. 2d DCA 1987), none of the facts alleged in the Complaint can support such an inference.  *See also Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997) ("[Although] a conspiracy may be proven by circumstantial evidence, this may be done 'only when the inference sought to be created by such circumstantial evidence outweighs all reasonable inferences to the contrary.'") (internal marks omitted).  The Complaint's allegations sum up to independent, parallel conduct by Telebrands and Perch that Tristar tries to gloss over with naked assertions of a conspiracy.  *See Twombly*, 550 U.S. at 556–57 ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

The only facts Tristar identifies as suggestive of an agreement are that (i) Perch knew that Telebrands had submitted the *ex parte* reexamination requests before it did (*i.e.*, before January 2024); and (ii) counsel for Telebrands attended a motions hearing in *Perch*, 1:22-cv-11301-DJC (D. Mass.) on February 7, 2024 and

conversed with counsel for Perch both before and after that hearing. But Perch following publicly available *ex parte* reexamination proceedings and Telebrands attending a public court hearing (on a matter, the Court notes, that was of at least tangential relevance to the pending litigation between Tristar and Telebrands) reveals nothing about whether the two conspired—over a year before—to tortiously interfere with Tristar's exclusive licensing arrangement with RTC. What's more, Tristar offers no explanation for why Telebrands and Perch would be incentivized to conspire to achieve this aim when ostensibly only one of them could ultimately enjoy the fruits of their supposed agreement (the rights to RTC's patent portfolio). *See Iqbal*, 556 U.S. at 680 (dismissal is proper when a conspiracy allegation "d[oes] not plausibly suggest an illicit accord because it [i]s not only compatible with, but indeed [i]s more likely explained by, lawful, unchoreographed free-market behavior."); *cf. Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 597 (1986) (holding that, absent a "*rational* economic motive to conspire," parallel "conduct does not give rise to an inference of conspiracy") (emphasis added).

As currently pleaded, Tristar has alleged a tin foil hat conspiracy—not a plausible one. Counts III and IV will be dismissed without prejudice to provide

Tristar with the opportunity, if possible, to cure the foregoing defects.[42]

### 4.    Counts V & VI:  Fraud (Against Telebrands and Snow)

Tristar's fraud claims against Telebrands and Snow are premised on their purported misrepresentations to (i) RTC during the negotiations over the assignment agreement; and (ii) the Patent Office during the course of the *ex parte* reexamination proceedings.  To make out a fraud claim, Tristar must allege "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation."  *Butler v. Yusem*, 44 So.3d 102, 105 (Fla. 2010).  Telebrands and Snow argue, among other things, that this claim must be dismissed because Tristar (as opposed to RTC or the Patent Office) cannot plausibly allege that it relied on the alleged misrepresentations to its detriment  and, to the extent Tristar's claim is premised on purported fraudulent statements to the Patent Office, it is preempted by federal law, *see Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001).  The Court agrees.

First, neither the alleged statements to RTC regarding the continued availability of past patent infringement damages after the assignment, nor the

---

[42] To be clear, this is not an invitation for Tristar to augment its Complaint with further allegations based solely "upon information and belief."  *See supra* Section III(B)(2).

allegedly false statements about the ownership of the RTC patent portfolio to the Patent Office, can support Tristar's fraud claims against Telebrands and Snow. Tristar cannot (and, in fact, does not) allege that it relied on either category of statements to its detriment, presumably because they were made to RTC and the Patent Office, not Tristar. *See, e.g.*, ECF No. 1 at ¶¶ 156 (alleging that RTC acted in reliance), 165 (alleging that the Patent Office acted in reliance). And, even if they had been communicated to Tristar, the totality of the Complaint indisputably establishes that Tristar never would have been duped by Telebrands' and Snow's alleged misrepresentations. *Cf. Besett v. Basnett,* 389 So. 2d 995, 998 (Fla. 1980) ("[A] recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him.").

The Court finds Tristar's argument that it "indirectly" relied on the alleged fraudulent statements unavailing. Tristar points to a line of cases holding that "[t]he maker of a fraudulent misrepresentation may be held liable for injury to a third party who justifiably relied on that fraudulent misrepresentation if the maker 'intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.'" *Delgado v. Rutledge*, 2024 WL 3570258, at *4 (S.D. Fla.

CASE NO. 3:24-cv-238-MCR-HTC

Mar. 29, 2024).  The allegations here, though, are far different from the games of telephone those cases dealt with.  The difference is this: Tristar's alleged injuries did not accrue from the actions *it took* in reliance on any putative misrepresentations that were repeated to it by a third party; Tristar's harms instead stem from the actions third parties (RTC and the Patent Office) took in alleged reliance on Telebrands' and Snow's misrepresentations.  Tristar provides no reason for the Court to jettison the requirement that a plaintiff plausibly allege first-party reliance in a common law fraud claim.  *See* Restatement (Second) of Torts § 537 (1977) ("The *recipient* of a fraudulent misrepresentation can recover against its maker for pecuniary loss resulting from it if, but only if, (a) *he relies* on the misrepresentation in acting or refraining from action, and (b) *his reliance* is justifiable.") (emphasis added).[43]

Second, the Court finds that Tristar's fraud claim is preempted to the extent it is premised on allegedly false statements that Telebrands and Snow made to the Patent Office.  State law causes of action are preempted when the federal government has the exclusive power to punish a violation of a federal statute or regulation.  *See Buckman*, 531 U.S. at 348.  In *Buckman*, the Supreme Court found

---

[43] To the extent Tristar's fraud claims can be construed as premised on putative misrepresentations to federal courts during the course the co-pending litigations, *see* ECF No. 1 at ¶ 118, they would fail for the same reasons as well as those discussed at length in Section III(A)(1) of this Order.

that a plaintiff's state law claims based on fraudulent representations made to the Federal Drug Administration by a medical device manufacturer were preempted by federal law that empowered the agency to punish and deter fraud perpetrated against it. *Id.* at 347–52. Applying *Buckman*, the Eleventh Circuit has likewise held that preemption prohibits private plaintiffs from bringing lawsuits to enforce a duty owed to a federal agency, such as the duty of candor and good faith owed to the Patent Office that Tristar invokes here. *Mink v. Smith & Nephew, Inc.*, 860 F.3d 1319, 1327–30 (11th Cir. 2017). In the patent realm, at least two district courts have ruled that federal law preempts state law fraud claims based on allegedly false statements made in connection with reexamination requests before the Patent Office. *See LCS Grp.*, 2019 WL 1234848, at *6 (holding that the plaintiff's "fraud claims based on the [patent reexamination request] are . . . preempted by federal patent law"); *Lockwood*, 2009 WL 9419499, at *11 ("[F]ederal patent law preempts Plaintiffs' fraud claim based on Defendants' filing reexamination requests before the [Patent Office] because such claims are 'no more than claims alleging bad faith misconduct before the [Patent Office].'") (internal marks omitted and original alteration accepted); *see also Semiconductor Energy Lab.*, 204 F.3d at 1382 (holding state RICO claim against patentee preempted because "[the plaintiff] alleges only the act of filing a false statement" with the Patent Office).

CASE NO. 3:24-cv-238-MCR-HTC

The Court consequently finds that Tristar's common law fraud claims, Counts V & VI, must be dismissed.

### 5.    Counts VIII & IX:  Conspiracy (Against Telebrands and Snow)

Finally, Tristar claims that Telebrands and Snow conspired to commit the fraudulent acts just described.  But since the Court found that Tristar's fraud claims are fatally flawed or otherwise preempted, there can be no actionable conspiracy claim either.  *See Turner v. Williams*, 65 F.4th 564, 590 (11th Cir. 2023) ("[A]n actionable conspiracy requires an actionable underlying tort or wrong." (quoting *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 764 F.3d 1327, 1339 (11th Cir. 2014))).  The Court therefore need not, and does not, reach the question of whether the allegations are sufficient to support a conspiracy between Telebrands and its outside counsel, Snow.  *See Chance*, 50 F.4th at 51 ("[U]nless a plaintiff alleges facts to establish that the attorney was acting outside the scope of the representation . . . a plaintiff cannot maintain a cause of action [for civil conspiracy] against the attorney.").  The Court will likewise dismiss Counts VIII & IX.

## IV.    Conclusion

Accordingly, Defendant Perch's motion to dismiss, ECF No. 28, Defendant Telebrands' motion to dismiss, ECF No. 29, and Defendant Jeffrey L. Snow's motion to dismiss, ECF No. 31, are **GRANTED** in part as follows:

1. Counts I, II, III, and IV are **DISMISSED** without prejudice and with leave to amend pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.  Any amendment is due within fourteen days of this Order.[44]

2. Counts V, VI, VIII, and IX are **DISMISSED** without prejudice pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure.[45]

3. Counts VII and X are **DISMISSED** with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[46]

---

[44] If Tristar chooses to replead, it must adequately allege the citizenship of each of Perch's members.  *See Underwriters at Lloyd's, London v. Osting–Schwinn*, 613 F.3d 1079, 1086 (11th Cir. 2010) (holding that, when pleading the citizenship of a limited liability company or other unincorporated entity, the citizenship of each of its members must be alleged to meet the diversity requirement).

[45] Because Counts V, VI, VIII, and IX failed at the "threshold question," *Wendt*, 822 So. 2d at 1260, of the personal jurisdiction analysis under Florida's long-arm statute, the Court must dismiss these claims without prejudice.  *See Posner*, 178 F.3d at 1221 (holding that complaints dismissed for want of personal jurisdiction must ordinarily be dismissed without prejudice and observing that "[t]his holding does not preclude further litigation of these claims on the merits, but it does preclude that litigation from occurring in Florida.").  Any amendment (at least under Florida law) would be futile, however, so the Court sees no reason to grant Tristar leave to amend these claims.

[46] For the sake of clarity, this includes Tristar's abandoned antitrust claim against Snow.

4.  Defendant Snow's request for oral argument, ECF No. 61, is **DENIED** as moot.

**DONE AND ORDERED** this 14th day of April 2025.

*M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

CASE NO. 3:24-cv-238-MCR-HTC